IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| DELAVAU, LLC, | CIVIL ACTION |
| Plaintiff, | |
| v. | |
| J.M. HUBER CORPORATION, | NO. 17-4005 |
| Defendant. | |

J. DuBois                                                                                          December 21, 2017

## M E M O R A N D U M

### I.     INTRODUCTION

This action arises out of J.M. Huber Corporation's alleged breach of a Supply Agreement entered into as a part of a Settlement Agreement to resolve a patent dispute. Presently before the Court is Defendant's Motion to Dismiss and to Stay. For the reasons that follow, the Motion is granted in part and denied in part.

### II.    BACKGROUND

The pertinent facts as set forth in plaintiff's Complaint are summarized as follows. Defendant processes and supplies calcium carbonate powder for use in pharmaceutical manufacturing. Compl. ¶ 7. Plaintiff uses calcium carbonate powder to manufacture calcium-based antacid tablets, vitamins and other supplements. Compl. ¶ 6. On August 27, 2012, plaintiff sued defendant for patent infringement in the United States District Court for the District of New Jersey, alleging that defendant infringed plaintiff's patent for a process used to prepare a high density calcium carbonate granulation. Compl. ¶ 8. Following settlement negotiations, the parties entered into a Settlement Agreement on May 15, 2014 ("2014 Settlement Agreement"). Compl. ¶ 10. As part of the 2014 Settlement Agreement, the parties

1

entered into a Supply Agreement that was executed simultaneously with the Settlement Agreement and has a term from May 15, 2014 through December 31, 2024. Compl. ¶¶ 12, 13.

Under the terms of the Supply Agreement, defendant agreed to sell plaintiff "a minimum of ninety percent (90%) of Buyer's [plaintiff's] requirements in the U.S. for qualified grades of calcium carbonate powder . . . ." Supply Agreement, Compl. Ex. C, ¶ 2.1. Subsequent to the signing of the Supply Agreement, plaintiff worked with defendant to qualify grades of calcium carbonate powder to satisfy plaintiff's requirements under the agreement. Compl. ¶ 19. Plaintiff continued to provide defendant with information regarding its manufacturing processes and calcium carbonate needs, including information with respect to the median particle size of the calcium carbonate powder and the particle size distribution parameters. Compl. ¶ 24. Pursuant to the Supply Agreement and the qualification process, defendant provided calcium carbonate powder to plaintiff with a particle size distribution that was consistent with plaintiff's manufacturing process for a period of approximately two years. Compl. ¶ 38.

In September 2015, following a change in management of defendant, defendant advised plaintiff of its belief that the Supply Agreement was "a terrible agreement" because of the low price that plaintiff was paying for the calcium carbonate. Compl. ¶ 29. Thereafter, defendant allegedly failed to comply with the terms of the Settlement Agreement by limiting the amount of calcium carbonate provided to plaintiff. Compl. ¶ 34. To resolve the alleged breach, the parties entered into a Settlement Agreement on August 3, 2016 ("2016 Settlement Agreement"), whereby defendant paid plaintiff $400,000 in damages resulting from that breach. Compl. ¶ 35.

According to plaintiff, shortly after defendant paid the $400,000 settlement pursuant to the 2016 Settlement Agreement, defendant began providing plaintiff with a calcium carbonate product that was "coarse and had a broader particle size distribution" which prevented plaintiff

2

from using that product in its manufacturing processes. Compl. ¶ 36. The calcium carbonate product at issue, HuberCal 150D, deviated substantially from the HuberCal 150D that defendant provided to plaintiff prior to August 2016. *Id.* Despite repeated attempts to work with defendant to improve the HuberCal 150D, defendant refused to meet with plaintiff or make improvements to the product. Compl. ¶¶ 50-55.

Plaintiff filed the instant suit on September 7, 2017, alleging breach of contract and two counts of breach of the implied covenant of good faith and fair dealing, with respect to both the Supply Agreement and the 2014 Settlement Agreement. Presently before the Court is Defendant's Motion to Dismiss and Stay. For the reasons that follow, Defendant's Motion to Dismiss and Stay is granted in part and denied in part.

### III. LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a party to respond to a pleading by filing a motion to dismiss for "failure to state a claim upon which relief can be granted." To survive a motion to dismiss, a plaintiff must allege facts that "'raise a right to relief above the speculative level.'" *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A district court first identifies those factual allegations that constitute nothing more than "legal conclusions" or "naked assertions." *Twombly*, 550 U.S. at 555, 557. Such allegations are "not entitled to the assumption of truth" and must be disregarded. *Iqbal*, 556 U.S. at 679. The court then assesses "the 'nub' of the plaintiff['s] complaint—the well-pleaded, nonconclusory factual allegation[s]"—to determine whether it states a plausible claim for relief. *Id.* Importantly, the

3

complaint's factual allegations "enjoy a highly favorable standard of review at the motion-to-dismiss stage." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 790 (3d Cir. 2016). Thus, "a complaint may not be dismissed merely because it appears unlikely that [a] plaintiff can prove those facts or will ultimately prevail on the merits." *Id*. 790–91 (quoting *Phillips v. Cty. Of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008)).

## IV. DISCUSSION

When ruling on a motion to dismiss, a court may consider the allegations in the complaint, exhibits attached to the complaint and matters of public record. *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3rd Cir. 1993). Plaintiff attached the 2014 Settlement Agreement and the Supply Agreement to the complaint. Accordingly, the Court considers those documents.

The Court addresses plaintiff's claims in the order addressed in the parties briefing, beginning with Count III before turning to Counts I and II.

### a. *Breach of Contract – Count III*

To state a claim for breach of contract under Delaware law[1] a plaintiff must demonstrate "first, the existence of a contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." *Kuroda v. SPJS Holdings, LLC*, 971 A.2d 872 (Del. Ch. 2009). The Court concludes that the facts alleged in the Complaint are sufficient when taken as true to state a claim for breach of contract.

The parties do not dispute the existence of a contract and plaintiff's Complaint sufficiently alleges resultant damage from the breach. Plaintiff asserts that it has spent approximately $15,000 per week in additional costs to purchase a calcium carbonate replacement

---

[1] The Supply Agreement contains a choice of law provision which provides that Delaware law shall govern disputes under the agreement. Supply Agreement, Compl. Ex. C, 10.5.

4

and that, as a result of defendant's alleged breach, plaintiff has suffered damages "including . . . increased costs, lost profits, disruption of business operations, replacement costs, equipment and other costs." Compl. ¶¶ 57,104.

The parties disagree, however, with respect to whether plaintiff adequately pleads a breach of an obligation imposed by the Supply Agreement. Plaintiff asserts that defendant breached the Supply Agreement—specifically Article 2.1, Article 5.3.4, and Schedule B—by providing a HuberCal 150D that is unusable in its manufacturing product because it is too course and has a broad particle size distribution. Defendant argues that plaintiff has not asserted a claim for breach of contract, because the Supply Agreement does not expressly specify a particle size distribution and particle size distribution cannot be implied in the agreement. Def.'s Mot. to Dismiss and Stay at 7. Plaintiff counters that, although the contract does not expressly state the particle size distribution, the parties worked together to "qualify" the calcium carbonate to plaintiff's specifications, as is reflected in the course of performance prior to August 2016. Accordingly, the particle size distribution is an implied provision that was a basic assumption underlying the Supply Agreement. Plaintiff also contends that it raises numerous allegations of a breach of contract, including failure to provide calcium carbonate to its specifications as required under Article 2.1 of the Supply Agreement, failure to cooperate and work with plaintiff in good-faith to discuss and implement improvements that would bring the product into compliance with its manufacturing requirements as required by Article 5.3.4, and failure to comply with the median particle size of 20 microns as provided by Schedule B of the Supply Agreement.

The Court begins its analysis of whether plaintiff has sufficiently alleged a breach of the contract by noting that the Supply Agreement contains seemingly inconsistent provisions, which are at the heart of this dispute. Several provisions of the Supply Agreement provide plaintiff

5

with significant control and discretion over its acceptance of defendant's calcium carbonate product, while other provisions of the contract disclaim warranties with respect to the product.

For example, Article 2.1 provides as follows:

> Seller [Huber] hereby agrees to sell and Buyer [Delavau] hereby agrees to buy, for its own use, during the Term of this Agreement, a minimum of ninety percent of Buyer's requirements in the U.S. for qualified grades of calcium carbonate powder, **which meet Buyer's specifications, including performance, regulatory, and specific customer requirements.** While the parties agree to make best efforts to qualify suitable Huber grades, Delavau will not be in breach of this commitment or this Agreement if Delavau's customers specify suppliers to the exclusion of Huber or if the Huber grades cannot meet performance characteristics such as taste. **Delavau will be the sole judge of suitability for its use of said calcium carbonate powder.** Supply Agreement, Compl. Ex C., Article 2.1 (emphasis added).

Similarly, Article 5.3.4 allows the plaintiff to inspect defendant's manufacturing facility and "[i]n the event that Buyer [plaintiff] identifies any potential improvements that could be made to the manufacturing process . . . the parties shall discuss such improvements in good faith and shall work together in good faith to implement any and all reasonable corrective and preventive actions agreed between the parties."

The Supply Agreement, by contrast, also contains a disclaimer stating: "Sale of the product is made on the understanding that there are no express or implied warranties that the product delivered hereunder will be merchantable or fit for any particular purpose." Supply Agreement, Compl. Ex C., Article 5.2. Yet the Supply Agreement requires that the supplied product conform to product specifications as outlined by Schedule B, which sets forth a list of physical and microbiological properties, including median particle size.[2] Supply Agreement, Compl. Ex C., Article 5.1.2.

---

[2] According to defendant, median particle size and particle size distribution refer to different qualities of the calcium carbonate.

The parties disagree over the obligations imposed by the Supply Agreement based on the above-mentioned provisions. Defendant asserts that Article 2.1, which recognizes plaintiff as the sole judge of the calcium carbonate product's suitability, applied only during the "qualification stage." During the qualification stage, the parties worked together to "qualify" the calcium carbonate product that defendant would provide to plaintiff. Plaintiff argues that defendant's obligation to provide the "qualified" product continues throughout the period of the Supply Agreement. Defendant contends that such an interpretation of the contract would render Article 5.1.2—which sets forth specifications for the product pursuant to Schedule B—and Article 5.2— which disclaims all warranties of merchantability and fitness—illusory.

The Court's central task is to determine the shared intent of the parties at the time of contracting. *Hartley v. Consolidated Glass Holdings, Inc.*, 2015 WL 5774751, at *7 (Del. Ch. Sept. 30, 2015). In so doing, the Court must consider the entire context of the contract to determine whether the provisions in dispute are ambiguous. *Fox v. Rodel, Inc*, No. 98-CV-531, 1999 WL 588293, at *6 (D.Del. July 14, 1999). "When the language of a contract is plain and unambiguous, the intent of the parties expressed in that language is binding." *Sun-Times Media Group, Inc. v. Black*, 945 A.2d 380, 389 (Del. Ch. 2008). If the terms of the contract are ambiguous, a court may look to extrinsic evidence to determine the intent of the parties. *Id.* However, in deciding a motion to dismiss, the Court "cannot choose between two differing reasonable interpretations of ambiguous provisions." *VLIW Technology, LLC v. Hewlett-Packard Co.*, 840 A.2d 608, 615 (Del. 2003). And when the parties "present differing—but reasonable—interpretations of a contract term," which requires the Court to examine extrinsic evidence to determine the intent of the parties, "such an inquiry cannot proceed on a motion to

dismiss." *Khushaim v. Tullow Inc.*, No. 11-CV-212, 2016 WL 3594752, at *3 (Del. Super. Ct. 2016).

The Court concludes that the seemingly conflicting provisions render the parties obligations under the contract ambiguous. The Supply Agreement purports to allow defendant to disclaim any warranty of merchantability or fitness, while at the same requiring defendant to provide a calcium carbonate product that complies with plaintiff's specifications, including performance, regulatory, and specific customer requirements and allows plaintiff to be the sole judge of that product. Both parties rely on the express language of the Supply Agreement to support their respective positions. Defendant focuses on a perceived conflict between those provisions that allow defendant to disclaim warranties of merchantability and fitness for a particular purpose to argue that Article 2.1 can only be interpreted as applicable to the qualification stage. Plaintiff argues that there is no conflict between the provisions and that Article 2.1 requires defendant to sell "qualified grades of calcium carbonate powder, which meet Buyer's specifications, including performance, regulatory, and specific customer requirements." Plaintiff also relies on the alleged course of dealing between the parties as evidence of the parties' intent. "Confronted with conflicting yet reasonable constructions of an ambiguous Agreement," the Court must deny defendant's Motion to Dismiss and to Stay with respect to plaintiff's breach of contract claim.[3] *Markow v. Synageva Biopharma Corp.*, No. 06-CV-152, 2016 WL 1613419, at *6 (Del. Super. Ct. Mar. 3, 2016).

Moreover, plaintiff's claim for breach of contract is not limited to defendant's failure to

---

[3] Defendant urges the Court to grant the motion to dismiss in part by arguing that the Court cannot read into the contract requirements that are not expressly provided for. In denying the motion to dismiss with respect to plaintiff's claim for breach of contract, the Court does no such thing; instead, the Court concludes that plaintiff has sufficiently pleaded facts that, if true, could under some conceivable set of circumstances, entitle plaintiff to relief.

provide a calcium carbonate product that conforms to plaintiff's desired particle size; plaintiff also asserts that defendant failed to comply with Article 5.3.4 and Article 2.1 of the Supply Agreement, both of which require defendant to work together with plaintiff in good faith to qualify and to improve the calcium carbonate product supplied. Specifically, plaintiff alleges that it has "provided comprehensive analytical data to Huber demonstrating the dramatic increase in particle size distribution" and, despite providing this information, "Huber has failed and refused to work together in good faith with Delavau to implement reasonable actions to correct Huber's manufacturing processes" with respect to HuberCal 150D. Compl. ¶ 54. Plaintiff also alleges that defendant breached the Supply Agreement by "providing HuberCal 150D that does not comply with the median particle size of 20 microns" as required under Schedule B. The Court concludes that the facts alleged in the Complaint, as construed in the light most favorable to the plaintiff, are sufficient to state a claim for breach of contract.

   *b. Breach of the Implied Covenant of Good Faith and Fair Dealing – Counts I and II*

  Plaintiff also asserts claims for a breach of the implied covenant of good faith and fair dealing with respect to both the 2014 Settlement Agreement (Count I) and the Supply Agreement (Count II). Defendant argues that the UCC governs both the Supply Agreement and the 2014 Settlement Agreement, because the Supply Agreement is a contract for the sale of goods and the alleged violation of the 2014 Settlement Agreement "derives from Huber's alleged violation of the Supply Agreement." Def.'s Mot. to Dismiss and Stay at 15. To that end, defendant argues that plaintiff's claims for breach of the implied covenant of good faith and fair dealing with respect to both Counts I and II, because the UCC does not recognize an independent cause of action for breach of an implied covenant of good faith and fair dealing.

9

The Court agrees that the UCC governs the Supply Agreement because it is a contract for the sale of goods; however, the Settlement Agreement is not a contract for the sale of goods but rather a contract to resolve a patent litigation. *See Novamedix, Ltd. V. NDM Acquisition Corp.*, 166 F.3d 1177, 1182 (settlement agreement releasing patent liability not a contract for sale of goods governed by UCC). Accordingly, the UCC does not govern the 2014 Settlement Agreement.

With respect to Count I for breach of the implied covenant of good faith and fair dealing of the 2014 Settlement Agreement, plaintiff must allege "(1) a specific implied contractual obligation; (2) a breach of that obligation; and (3) resulting damage." *Markow*, 2016 WL 1613419 at *7. Plaintiff alleges that the Settlement Agreement was premised on defendant's compliance with the Supply Agreement, which was executed simultaneously. According to plaintiff, defendant acted unreasonably and arbitrarily by providing a calcium carbonate product with an unreasonably large particle size distribution, "thereby frustrating the fruits of the bargain that Delavau reasonably expected from the 2014 Settlement Agreement and Supply Agreement." Compl. ¶ 75. Plaintiff further alleges that the Settlement Agreement and corresponding Supply Agreement has a value to plaintiff that exceeds ten million dollars. Compl. ¶ 17.

The Court concludes that these allegations are sufficient, at this juncture, to state a claim for breach of the implied covenant of good faith and fair dealing with respect to the 2014 Settlement Agreement. Defendant's Motion to Dismiss is therefore denied with respect to Count I.

The Court now turns to Count II and agrees with defendant that Count II must be dismissed. "Merely repeating the defendant's allegedly improper acts or omissions already the subject of a separate breach of contract claim is insufficient to support a claim for breach of the

implied covenant of good faith and fair dealing." *Khushaim*, 2016 WL 3594752 at *4; *see Northview Motors v. Chrysler Motors*, 227 F.3d 78, 92 ("a party is not entitled to maintain an implied duty of good faith claim where the allegations of bad faith are 'identical to' a claim for relief under an established cause of action"). The Court finds little distinction between the allegations asserted in plaintiff's Count III for breach of contract and those allegations asserted in plaintiff's Count II for breach of the implied covenant of good faith and fair dealing with respect to the Supply Agreement. Accordingly, defendant's Motion to Dismiss is granted with respect to Count II.

## V. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss and Stay is granted with respect to Count II and denied with respect to Counts I and III. Because the Court has decided those parts of the Motion seeking dismissal, defendant's request to stay discovery pending the outcome of the Motion to Dismiss is denied. The denial of the Motion in part is without prejudice to defendant J.M. Huber's right to raise the issues presented in the Motion after the completion of discovery by motion for summary judgment and/or at trial.